SCATTERED CORPORATION and Laura Bryant, Plaintiffs–Appellants,

v.

CHICAGO STOCK EXCHANGE, INC., Defendant–Appellee.

No. 95–3616.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1996.

Decided Oct. 24, 1996.

Elizabeth D. Sharp, Paul A. Hybel, Leland W. Hutchinson, Jr. (argued), Nigel F. Tel-

man, Jennifer Fitzgerald, Freeborn & Peters, Chicago, IL, for Scattered Corporation.

Elizabeth D. Sharp, Paul A. Hybel, Leland W. Hutchinson, Jr., Nigel F. Telman, Freeborn & Peters, Chicago, IL, for Laura Bryant.

Douglas Hagerman (argued), Foley & Lardner, Milwaukee, WI, John D. Lien, Carolyn E. Knecht, Foley & Lardner, Chicago, IL, for Chicago Stock Exchange, Incorporated.

Before EASTERBROOK, RIPPLE, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Scattered Corporation, a member of the Chicago Stock Exchange, is an arbitrageur specializing in the securities of bankrupt corporations. It also wants to serve as a market maker for other arbitrageurs who do business in these stocks. Between June 1994 and June 1995 Scattered cleared its market-making trades through Prudential Securities. But on June 8, 1995, the Exchange informed Prudential that Scattered was not a market maker for TWA stock (or any other firm's)—and that the Exchange would register Scattered as a market maker only if it opened a "V Account" at Midwest Clearing Corporation. A "V Account" had tracking features so that the Exchange would know a market maker's net position in the stocks it traded—knowledge of obvious value after an episode in which Scattered sold short more stock of LTV Corporation than LTV had outstanding. See *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir.1995). Scattered refused to comply, and Prudential stopped extending it the privileges of a market maker, which Scattered says costs it $80,000 a day.

Scattered contends in this suit that the Exchange's requirement violates § 11A(c)(5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78k–1(c)(5), a provision added to the Act as part of comprehensive legislation in 1975 directing the Securities and Exchange Commission to establish a "national market system." Section 11A(c)(5) reads:

No national securities exchange or registered securities association may limit or

condition the participation of any member in any registered clearing agency.

Scattered's theory is that by requiring market makers to have "V Accounts" at Midwest Clearing Corporation, the Exchange had limited or conditioned the use of Prudential's clearing services. The Exchange replied that it had no objection to Scattered's use of Prudential but needed the information a "V Account" supplied. The Exchange also sought to head the case off at the pass: it observed that nothing in the '34 Act creates a private right of action to implement § 11A(c)(5). According to the Exchange, only the SEC or a criminal prosecutor may sue to enforce § 11A(c)(5). The district court agreed with this contention and dismissed the case on the pleadings. Since the district court's action, the Exchange has replaced the "V Account" requirement with other trade-tracking controls. The SEC's Division of Market Regulation approved the amendments to the Exchange's rules that accomplished this change (and several others). SEC Release No. 3436723 (Jan. 16, 1996). Scattered filed a petition for review, which we dismissed in an unpublished order because Scattered had neglected to ask the Commission to overturn the Division's action. *Scattered Corp. v. SEC,* No. 96–1618 (7th Cir. May 24, 1996). While the Exchange was revising its rules, Scattered had asked the SEC to throw out the "V Account" requirement. The Commission dismissed Scattered's application as moot in light of the changes approved in January—though it observed that "[i]f Scattered again seeks to become a … market maker and the Exchange rejects its application under the Exchange's new rules, Scattered can seek review of the validity of the Exchange's action at that time." SEC Release No. 34–37249 (May 29, 1996), at 6. What remains of this suit, therefore, is the possibility of damages for losses Scattered incurred under the Exchange's former requirements.

Between 1964 and 1971 the Supreme Court frequently created new private rights of action to enforce provisions of the securities laws, reasoning that private suits are helpful supplements to administrative and criminal enforcement. E.g., *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). Since 1975, however, the Court has asked not whether a private action would be a good idea, but whether the legislature has concluded that it is a good idea. *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Legislatures express their intents by enacting statutes; an intent without a supporting text is not law. *Lincoln v. Vigil,* 508 U.S. 182, 192, 113 S.Ct. 2024, 2031, 124 L.Ed.2d 101 (1993); *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 501, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988). Disputes about "implied" rights of action arise only when the statute does not bestow enforcement rights on the plaintiff, so a search for a legislative decision almost always means that the person who wants the court to imply a private right of action loses. There must be an indication in the statute's text or structure that private enforcement has been authorized.

In securities case after securities case from 1975 forward, the Court has rebuffed requests to imply rights of action. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). See also *Spicer v. Chicago Board of Options Exchange, Inc.,* 977 F.2d 255 (7th Cir.1992) (applying these cases to hold that there is no implied private right of action to enforce § 6(b) of the '34 Act). Although the Court has declined to rescind the implied rights of action recognized in earlier years, see *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S.

353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), it has been unwilling to expand them either, see *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1099–1106, 111 S.Ct. 2749, 2761–65, 115 L.Ed.2d 929 (1991)—and it has begun to insist that the implied rights track the terms of the express statutory rights of action (e.g., *Musick, Peeler & Garrett v. Employers Insurance of Wausau,* 508 U.S. 286, 294–98, 113 S.Ct. 2085, 2089–92, 124 L.Ed.2d 194 (1993) (contribution among defendants); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (statutes of limitations)). As we see it, Scattered is asking nothing less than that we cast aside the prevailing approach to this subject, return to the approach of *Borak,* and create a private right of action on no more secure footing than that it would be a good idea, coupled with the absence of any legislative history stating that private suits are a bad idea.

For that is all the legislative history Scattered can muster. It discounts statements in the Senate—which do frown on private suits—by saying that the legislation that became § 11A(c)(5) originated in the House. Having combed the committee reports and floor statements in the House, Scattered informs us that no one spoke against private enforcement. Maybe not; we have not repeated the exercise, because we do not think it important. Legislative silence counts for nothing under the approach of *Touche Ross* and later cases. Scattered needs not silence but authorization. Statements in the legislative history could show that an ambiguous clause in the statute is designed to ordain private suits; it might show that through some technical error cross-references that would have authorized private suits were garbled; but silence is unhelpful.

Where it counts—that is, in the enacted law—Congress was *not* silent. It created one right of action (administrative or judicial) after another, and gave each to the SEC. For example, § 11A(b)(6) reads: "The Commission, by order, may censure or place limitations upon the activities, functions, or operations of any registered securities information processor [that violates] any provision of this title or the rules or regula-

tions thereunder." Section 11A(c)(3)(A) begins: "The Commission, by rule, is authorized to prohibit brokers and dealers from...." *Touche Ross* and many other cases tell us that such plentiful express provisions for public enforcement are inconsistent with implying rights of private enforcement. Nonetheless, Scattered tries to turn the structure of § 11A to its advantage. Scattered thinks that the profusion of express rights of action makes silence in § 11A(c)(5) suspicious—for recall that § 11A(c)(5) prohibits exchanges from doing something, without saying who is to enforce the prohibition. Because § 11A(c)(5) does not hand enforcement powers to the SEC, Scattered believes, it implicitly authorizes private litigation.

Nice try, but implausible. Most subsections in § 11A authorize regulation of some kind—the issuance of rules, the interpretation and enforcement of provisos, and so on. Section 11A(c)(5) is a clean prohibition, which does not depend on rulemaking. It limits what exchanges may do, either by adopting their own new rules or by interpreting existing ones. (The Exchange said that the "V Account" requirement was based on its interpretation of a rule that long predated the enactment of § 11A.) Authority for the SEC to control what stock exchanges put in (or find in) their operating rules appears not in § 11A but in § 19(c), 15 U.S.C. § 78s(c), which was rewritten as part of the legislative package that included § 11A. Until 1975 stock exchanges could adopt, change, repeal, and interpret rules without the SEC's approval, although the Commission was authorized to review them later. In the 1975 amendments the SEC acquired a power of prior review, coupled with authority to "abrogate, add to, and delete from" exchanges' existing rules. Scattered appealed to the SEC's power under § 19(c) when asking the Commission for relief from the "V Account" requirement. Although the SEC dismissed Scattered's application after the Exchange dropped the requirement, it invited Scattered to file anew if it encountered continuing troubles registering as a market maker. So enforcement of § 11A(c)(5) is readily available; aggrieved parties complain to the SEC, not to a judge. Separate provision of authority

in § 11A(c)(5) would have been redundant. And that is not all. Section 21, 15 U.S.C. § 78u, confers on the Commission power to investigate and provide remedies for any violation of the '34 Act, and to initiate litigation that will lead to monetary penalties. Section 21(d)(3) includes a table of monetary penalties, which a private damages action would evade. Section 21C, 15 U.S.C. § 78u–3, gives the SEC cease-and-desist authority for the '34 Act. Finally, § 32(a), 15 U.S.C. § 78ff(a), makes any wilful violation of § 11A (like all but one provision of the '34 Act) a felony, punishable by fine and imprisonment. Section 11A(c)(5) does not lack for enforcement mechanisms.

One last structural clue is significant. Section 11A(c)(5) is a prohibition: "No national securities exchange or registered securities association may ...". It does not confer rights on anyone, except by indirection. The difference between a grant of personal rights and a prohibition has been important to the Supreme Court. E.g., *Cannon v. University of Chicago*, 441 U.S. 677, 690–91, 99 S.Ct. 1946, 1954–55, 60 L.Ed.2d 560 (1979); *Karahalios v. National Federation of Federal Employees*, 489 U.S. 527, 533–34, 109 S.Ct. 1282, 1286–87, 103 L.Ed.2d 539 (1989); see also *Israel Aircraft Industries Ltd. v. Sanwa Business Credit Corp.*, 16 F.3d 198, 200–01 (7th Cir.1994). Sometimes the lack of a private action is a concession that enables the legislature to enact anything at all, and Congress can signal this decision by the form of rule it adopts. Enacting a prohibitory rule also facilitates a tradeoff between the level of penalties and the frequency of enforcement, a balance that could be disrupted by private litigation. Compare Gary S. Becker & George J. Stigler, *Law Enforcement, Malfeasance, and Compensation of Enforcers*, 3 J.Leg.Stud. 1 (1974), with William M. Landes & Richard A. Posner, *The Private Enforcement of Law*, 4 J.Leg.Stud. 1 (1975). Section 11A(c)(5) is squarely on the prohibitory side of the line, and it must be enforced using the '34 Act's own devices.

AFFIRMED.