Carlos CHAPA, Plaintiff–Appellant,

v.

Jura ADAMS, et al., Defendants–Appellees.

No. 98–1869.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1999.

Decided Feb. 23, 1999.

Michael F. Lefkow (argued), Chicago, IL, for Plaintiff–Appellant.

James K. Horstman, David E. Neumeister (argued), Williams & Montgomery, Chicago, IL, for Jura Adams.

Jeffrey I. Cummings, Miner, Barnhill & Galland, Chicago, IL, for Bruce Fletcher, Rush–Presbyterian–St. Luke's Health Plans Inc., Rush–Prudential Health Plans, Inc. and Mental Health for Prepaid Plans, Inc.

Before Easterbrook, Kanne, and Diane P. Wood, Circuit Judges.

EASTERBROOK, Circuit Judge.

After repeatedly coming to work at Peoples Gas Light & Coke Company under the influence of alcohol, cocaine, and marijuana, Carlos Chapa was placed on leave (with full pay) and told that he would be fired unless he completed a substance-abuse program. He completed the first stage of a narcotics and alcohol program at Rush Anchor Health Maintenance Organization (affiliated with Rush–Presbyterian–St. Luke's Hospitals) and returned to work. Later, however, Rush Anchor expelled Chapa from the program because Jura Adams, a psychiatrist to whom Chapa had been referred when he grew depressed over his precarious economic position and poor prospects for promotion, concluded that Chapa was potentially homicidal. The district court summarized: "[Chapa told Adams] that he had been in a gang as a young man, that he had dealt drugs for a time, and that he had 'roughed some people up' when he was in the gang. In response to Chapa's statements about his work problems, Dr. Adams asked him whether he harbored ill feelings toward anyone at Peoples Gas. He told her about his belief that his supervisor was persecuting him, and said that he 'wouldn't mind killing him sometimes.' Cha-

pa also told Dr. Adams, 'I wouldn't personally hurt him, but I know people who would.' Throughout the meeting, Chapa gave Dr. Adams the impression that he was very angry." 1997 WL 414107 at *2, 1997 U.S. Dist. Lexis 10599 at *8. Adams told Bruce Fletcher, who managed the substance-abuse program, about Chapa's statements and her conclusion that Chapa posed a genuine risk; Fletcher banished Chapa from the program and informed Peoples Gas, which fired him.

Two principal claims remain in Chapa's suit: first, that Adams violated federal law by revealing Chapa's threat without prior judicial approval under 42 U.S.C. § 290dd–2; second, that Fletcher, Adams, and Rush Anchor violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794, by removing Chapa from the substance-abuse program because of his disabilities. The district court concluded that the Rehabilitation Act does not address distinctions *among* persons with disabilities, see *Grzan v. Charter Hospital of Northwest Indiana,* 104 F.3d 116 (7th Cir.1997)—and everyone in Rush Anchor's substance-abuse program has a drug problem, so exclusion from the program can't be a form of discrimination against people with drug problems. Summary judgment for the defendants followed. As for the first issue: the judge denied Chapa's motion to amend his complaint to add a claim under § 290dd–2, ruling that the amendment would be futile because there is no private right of action to enforce that statute. The district judge resolved additional claims against other defendants, but these have fallen by the wayside.

Section 290dd–2 is a criminal prohibition, and it has been a long time since the Supreme Court used a criminal law as the basis of a private civil action. Some statutes defining crimes also authorize agencies to file civil suits, and the Court has occasionally held that these may be supplemented by private enforcement—though decisions such as *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the prime exemplar of this approach, have been in bad odor since the late 1970s. See *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Transamerica*

*Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Today the principal question is whether the statute creates rights in favor of identified persons. If yes, a private action to enforce these rights is apt to be inferred; otherwise not. Compare *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), and *Cannon v. University of Chicago,* 441 U.S. 677, 688 & n. 9, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), with *Karahalios v. National Federation of Federal Employees,* 489 U.S. 527, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989); *Scattered Corp. v. Chicago Stock Exchange,* 98 F.3d 1004 (7th Cir.1996); and *Israel Aircraft Industries Ltd. v. Sanwa Business Credit Corp.,* 16 F.3d 198 (7th Cir.1994). Criminal statutes, which express prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are accordingly poor candidates for the imputation of private rights of action. *Karahalios,* 489 U.S. at 533, 109 S.Ct. 1282; *Transamerica Mortgage Advisors,* 444 U.S. at 19–20, 100 S.Ct. 242.

Personal rights could in principle be derived from criminal statutes. The rule "do not rob a bank" implies that a bank has a right not to be robbed. But the Supreme Court has been unwilling to treat criminal laws as implying private entitlements in this fashion and has held that the victims of crime therefore lack any legal right to compel a criminal prosecution. *Leeke v. Timmerman,* 454 U.S. 83, 102 S.Ct. 69, 70 L.Ed.2d 65 (1981); *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). That reluctance to form private entitlements from criminal prohibitions blocks the judicial creation of private rights of action as well.

■ Only once before has the question whether § 290dd–2 supports a private damages action reached a court of appeals: *Ellison v. Cocke County,* 63 F.3d 467 (6th Cir. 1995), held that it does not. We agree with *Ellison.* Like other criminal statutes, § 290dd–2 creates rights in favor of society, not just particular members of society. Judge Ryan, concurring in *Ellison,* 63 F.3d at 472, observed that "the statute's broad purpose is to combat, in a number of ways, this nation's crippling drug abuse problem

and to do so primarily by encouraging addicts to seek treatment voluntarily." Addicts will be more likely to accept treatment—and the rest of society therefore will be better off—if treatment is confidential. Drug addiction is not a contagious disease, so confidentiality appears to be costless for the rest of society. This hardly implies that substance abusers have a legal right to collect damages from persons who reveal details about their participation in a program to persons who already know about the subject—for example, Peoples Gas, which placed Chapa in the Rush Anchor program, paid for his treatment, and had a legitimate interest in the results. Reading § 290dd–2 as creating a private right to collect damages from medical professionals who gave information to employers would make firms less willing to send employees to substance-abuse programs. If Chapa prevails today, then tomorrow persons in his position might be fired at the first sign of drug abuse rather than be sent for help. Not only society but also drug abusers would be worse off. So we are content to leave enforcement of § 290dd–2 to the criminal process. Prosecutorial discretion has a large role to play in confining the application of this statute to situations where confidentiality protects the interests of society. Section 290dd–2 *allows* prosecution in a case such as this—there is an exception to the prior-judicial-approval requirement for threats of *child* abuse, but no exception for threats to the lives of adults, see § 290dd–2(e)—but it is unlikely that prosecutors would target psychiatrists who reveal potential hazards to human life, and we do not think that the sound exercise of prosecutorial discretion creates a "gap" to be filled by private litigation.

■ Although the Rehabilitation Act does create a private right of action, it likewise offers Chapa no relief. Everyone in the Rush Anchor substance-abuse program is (or was) a drug abuser; everyone who has ever been expelled from that program is (or was) a drug abuser; where's the discrimination against drug abusers? We appreciate Chapa's reply that a mental condition that predisposes one to violent outbursts may itself be a disability. *Palmer v. Circuit Court of*

*Cook County,* 117 F.3d 351 (7th Cir.1997), holds that depression and paranoia can be disabilities for purposes of the Americans with Disabilities Act, which parallels the Rehabilitation Act. Chapa believes that Dr. Adams misunderstood him, and that he poses no risk to anyone (a position that we accept for purposes of the appeal); on this view Chapa was *perceived* as suffering from a disability, even though he was not.

Logically there is no obstacle to a suit under the Rehabilitation Act by a person excluded from a program limited to the disabled on account of an unrelated disability: consider, for example, a claim by someone kicked out of the Rush Anchor drug program because he is HIV-positive, see *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), or blind. Nothing in *Grzan* forecloses the possibility that discrimination against persons with multiple disabilities may be actionable, even when the program in question is open only to persons with some disabilities.

But Chapa's second disability—an actual or perceived risk of violence—is a legitimate ground of decision. Nonviolent drug abusers are more likely to receive the benefits of the Rush Anchor program if predators can be excluded from their midst. Section 504 of the Rehabilitation Act provides (emphasis added):

> No *otherwise qualified* individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The "otherwise qualified" phrase, which also appears in the ADA, supplied the foundation of our conclusion in *Palmer* that, although paranoia is a "disability," a person whose disability disposes him to violent outbursts is not "otherwise qualified" for employment; an employer need not "accommodate" the disability by hiring guards to watch its workforce. Just so here. Rush Anchor was entitled to establish a program for mild-mannered drug abusers, and people who threaten to kill their supervisors are not "qualified" for such a program even if their threats are hollow. Substance-abuse programs often try to help participants control their anger; an inability to deal with participants whose anger is out of control would send the wrong message to others. Chapa had for some time been insistent that he did not have to follow the program's rules—that he knew better than Fletcher how to deal with his problems. Fletcher was legally entitled to treat the threat as the last straw, and to conclude that Chapa was no longer qualified for the Rush Anchor program.

AFFIRMED.