# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No.  02-2226
_____

Heidi Frison,                                    *
                                                 *
       Plaintiff - Appellant,        *
                                                 *
Erica Frison,                                    *
                                                 *
       Plaintiff,                    *
                                                 *  Appeal from the United States
    v.                                *  District Court for the District
                                                 *  of Minnesota.
Daniel J. Zebro, sued as Officer Daniel          *
J. Zebro; Sgt. Peck; Officer Scagle;             *
Officer S. Bystrom; Officer Merrill;             *
                                                 *
       Defendants - Appellees,       *
                                                 *
Jane Doe, (whose true name is                    *
unknown); John Smith; Jim Jones,                 *
(whose true name is unknown), all                *
in their personal and official capacities;       *
                                                 *
       Defendants,                   *
                                                 *
City of St. Paul, Minnesota,                     *
                                                 *
       Defendant-Appellee,           *
                                                 *
Todd Feroni, Officer,                            *
                                                 *
       Defendant - Appellee.         *
                                                 *

_____

Submitted: February 12, 2003
Filed: August 21, 2003
_____

Before WOLLMAN, HEANEY, and MELLOY, Circuit Judges.
_____

MELLOY, Circuit Judge.

Heidi Frison appeals the district court's[1] adverse grant of summary judgment in this civil rights action arising out of a police investigation into alleged crack cocaine distribution out of Frison's home. We affirm.

I.

In the spring of 2000, the St. Paul Police FORCE[2] unit received a complaint from a St. Paul resident concerning criminal activity occurring at 1069 Greenbrier, the house next door.[3] According to the complainant, drug sales were conducted at 1069 Greenbrier at all hours of the day. The complainant told police that she had seen bags of drugs and heard drug dealing conversations, and that she had made similar complaints to police in the past about the criminal activity next door.

_____

[1] The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

[2] The FORCE acronym stands for "Focusing Our Resources on Community Empowerment."

[3] During discovery, the defendants produced a computer-generated printout documenting phone calls and/or police visits to 1069 Greenbrier. Between September 1, 1999, and June 5, 2000, the police received over 85 calls about or from 1069 Greenbrier.

Following a three month investigation into the allegations, including surveillance and a controlled drug purchase, Officer Daniel Zebro of the St. Paul Police FORCE applied for, and received, a search warrant for 1069 Greenbrier. The warrant was scheduled to be executed on the evening of June 6, 2000. Prior to execution of the warrant, Officer Zebro and FORCE unit member Todd Ferroni scouted the area around the house. Officer Zebro intended to set up reconnaissance from the complainant's home, located next door to 1069 Greenbrier. While at the complainant's door, the officers encountered Heidi Frison sitting outside of 1069 Greenbrier. She asked the two officers, who were not in police uniform, who they were. The officers told her that they were census workers. Frison then told the "census workers" that she lived at 1069 Greenbrier with her children.

Later that evening, fifteen members of the FORCE unit, dressed in riot gear, executed the search warrant at 1069 Greenbrier. Frison's daughter and grandchild were on the premises at the time. Also present were Jessie Banks and Richard Rhiems, who were living in the attic at 1069 Greenbrier. Frison was detained as she approached the house, and then handcuffed and seated in the living room with her daughter.

During the search, officers recovered a substance that they suspected was crack cocaine. They also found U.S. mail addressed to Heidi Frison, seven cell phones, plastic baggies near the suspected crack cocaine, and $653 in cash. Based on the initial findings of the search, Heidi Frison was arrested for operating a disorderly house in violation of Minnesota Statute § 609.33,[4] despite her assertion at that time

---

[4] Under this statute, the operation of a disorderly house is a gross misdemeanor. A disorderly house is defined as a place in which the violation of controlled substances laws are habitual. Minn. Stat. § 609.33, subd. 1(4). Evidence of unlawful possession of a controlled substance is prima facie evidence of the existence of a disorderly house. Id., subd. 4.

that she did not live in the house. Subsequent testing proved that the substance was not crack cocaine and the charges against Frison were dropped.

Due to the condition of 1069 Greenbrier at the time of the execution of the search warrant, Sergeant John Peck notified the St. Paul housing inspector. The inspector evaluated the home and cited twenty-six violations, including the fact that there was no running water on the premises. As a result, the property was condemned and the inspector issued an order for the occupants to immediately vacate the house. Heidi Frison arranged with police to remove personal items from the home after the condemnation. She placed those items in storage, but failed to pay the storage fees and the items were seized by the storage company.

Frison brought suit against the City and numerous individual officers involved in the investigation of 1069 Greenbrier and the execution of the search warrant at that address. The defendants were granted summary judgment on all counts. Frison appeals the district court's ruling, asserting the following: (1) that the district court erred in concluding that Frison does not have a cause of action under § 1983 based on the officers' impersonation of United States census workers in violation of a federal criminal statute, 18 U.S.C. § 912; (2) that the district court erred in concluding that Frison has not demonstrated a triable Fourth Amendment violation for arrest without probable cause; and (3) that the district court erred in concluding that Frison had not demonstrated a triable Fourth Amendment violation based on the police officers' conduct during and after execution of the search warrant.[5]

_____

[5] Frison has appealed only these three aspects of the district court's ruling. Her various other constitutional and tort claims against the City and individual officers are thus forfeited.

## II.

"We review a district court's grant of summary judgment de novo, giving the nonmoving party the most favorable reading of the record." Cooksey v. Boyer, 289 F.3d 513, 515 (8th Cir. 2002); Gentry v. Georgia-Pacific Corp., 250 F.3d 646, 649 (8th Cir. 2001). "Summary judgment 'is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim.'" Id. at 649-50 (quoting Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2000)).

"In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." Cooksey, 289 F.3d at 515 (citations omitted). Here, it is undisputed that the police acted under color of state law. At issue is whether the district court erred in concluding that Frison cannot show deprivation of a constitutionally protected federal right.

A.     Fourth Amendment claims:

We agree with the district court's conclusion that the defendants were entitled to summary judgment on Frison's § 1983 claims based on alleged Fourth Amendment violations. As to Frison's claim that the police arrested her without probable cause, we find more than sufficient evidence to support the arrest. See United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001) ("Probable cause to conduct a warrantless arrest exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested."). At the time of the arrest, police were executing a valid

-5-

search warrant at 1069 Greenbrier for suspicion of drug trafficking operations. Police found what they suspected was crack cocaine and other indicia of drug distribution in the home. They also found mail addressed to Heidi Frison at the 1069 Greenbrier address. Frison's child and grand child were on the premises when the search was initiated and Frison was detained approaching the residence. Although Frison at some point disavowed actually living at the house, the facts and circumstances available to police officers at the time were more than sufficient to lead a prudent person to believe that 1069 Greenbrier was a "disorderly house" within the meaning of Minnesota Statute § 609.33, and that Frison was responsible for the disorderly house.

We also agree that Frison cannot show a Fourth Amendment violation based on the officers' conduct during and after the search. Frison asserts that police officers trashed her home in executing the search warrant and then arranged for the house to be condemned by the City housing inspector based on the uninhabitable conditions that the police created. We find nothing in the record to support Frison's allegation that the inspector's involvement in this case was improper or out of the ordinary. The inspector cited twenty-six principal violations in his condemnation report, including a lack of running water, unsanitary conditions in the toilets and sinks, an insect infestation, evidence of a rodent infestation, and hazardous electrical wiring. Frison admitted that there was no running water at the house and conceded that the attic tenants may have been using the toilets and sinks. Frison asserts that the house was clean prior to the search and that any mess was caused by officers dumping the contents of drawers and cabinets in the process of conducting their search. Frison's allegations do not negate the valid basis for the City housing inspector's decision to condemn the house. The district court properly granted summary judgment to the defendants on this claim.

B.     Violation of 18 U.S.C. § 912

Frison's final claim of error involves the district court's conclusion that Frison cannot base a 42 U.S.C. § 1983 action on the police officers' violation of 18 U.S.C. § 912.  Section 912 provides that "[w]hoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or office thereof, and acts as such, . . . shall be fined under this title or imprisoned not more than three years, or both."  18 U.S.C. § 912.  There is no dispute that, prior to the execution of the search warrant, two police officers falsely told Frison that they were United States census workers, and that Frison told them she and her children lived at 1069 Greenbrier.

Frison's claim appears to be that the police used her admission, obtained by violating 18 U.S.C. § 912, to establish that she was the proper party to arrest for the disorderly house charge.  Frison asserts that, contrary to her statement to the census workers, she was not living at 1069 Greenbrier at the time of the raid, but rather was living nearby with friends.  She further asserts that she and her children moved out of 1069 Greenbrier when the water was shut off in mid-May.  And, while she was hoping to eventually purchase the house, at the time of the raid it was owned and occupied by people unrelated to her.  Frison contends that absent the fraudulently obtained statement that she lived in the house, the officers would not have arrested her in conjunction with the disorderly house charge.

We have already held that the officers had probable cause to arrest Frison based on their findings while executing the search warrant.  Although Frison states she did not live at 1069 Greenbrier on the date of the search, she concedes that she kept many belongings there and still received mail there.  At the time of the raid, one of Frison's children and her grandchild were on the premises, and Frison was detained as she approached the house.  Because there was ample evidence at the residence to connect Frison to the house, and to support the officers' belief that she was the appropriate

party to arrest for the disorderly house charge, we doubt Frison could show that any claimed damages were caused by the officers' violation of 18 U.S.C. § 912. However, we need not decide whether this factual dispute rises to the level of a genuine issue because, after careful consideration, we agree with the district court that the police officers' admitted violation of 18 U.S.C. § 912 will not support a civil rights claim under 42 U.S.C. § 1983.

Violation of a federal statute does not automatically give rise to a civil rights claim under § 1983. This is because "[i]n order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." Blessing v. Freestone, 520 U.S. 329, 340 (1997) (emphasis in original); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) ("[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983].") (emphasis in original). Section 1983 provides a method of redress only for those federal statutes which "create enforceable rights, privileges, or immunities within the meaning of § 1983." Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 423 (1987). The plaintiff bears the burden to demonstrate that the statute at issue confers a federal right on the plaintiff. Arkansas Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 523 (8th Cir. 1993). The Supreme Court recently clarified that nothing short of an "unambiguously conferred right" will support a cause of action brought under § 1983. Gonzaga Univ., 536 U.S. at 283.

The touchstone for determining whether a statute confers a private right of action is congressional intent. Thompson v. Thompson, 484 U.S. 174, 179 (1988). "'[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" Id. (quoting Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 94 (1981)); see also Gonzaga Univ., 536 U.S. at 286 ("[W]here the text and structure of a statute provide no indication that Congress

intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action."). There is nothing in the language of 18 U.S.C. § 912 to suggest that Congress intended to create a private right of action or a private remedy for a violation of its proscription against impersonating a United States officer. To the contrary, the statutory language establishes that Congress intended the statute to be enforced through the imposition of criminal penalties. See id. at 287 (finding no private right of action where statute at issue lacked "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights") (citation omitted).

The statutory structure also weighs against a private right of action in this case. The fact that Frison is basing her § 1983 claim on the violation of a criminal statute "does not necessarily preclude the implication of a private cause of action for damages," Cort v. Ash, 422 U.S. 66, 79 (1975), but it is well-settled that criminal statutes will rarely survive § 1983 analysis. As noted by the Seventh Circuit:

> Criminal statutes, which express prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are . . . poor candidates for the imputation of private rights of action. . . . [T]he Supreme Court has been unwilling to treat criminal laws as implying private entitlements . . . and has held that the victims of crime therefore lack any legal right to compel a criminal prosecution. That reluctance to form private entitlements from criminal prohibitions blocks the judicial creation of private rights of action as well.

Chapa v. Adams, 168 F.3d 1036, 1038 (7th Cir. 1999) (citations omitted). See also Doe v. Broderick, 225 F.3d 440, 447-48 (4th Cir. 2000) ("The Supreme Court historically has been loath to infer a private right of action from 'a bare criminal statute,' because criminal statutes are usually couched in terms that afford protection to the general public instead of a discrete, well-defined group.") (quotation and

citation omitted); West Allis Mem. Hosp., Inc. v. Bowen, 852 F.2d 251, 254 (7th Cir. 1988) (noting the strong presumption against recognizing a private right of action under a criminal statute). And in California v. Sierra Club, 451 U.S. 287 (1981), the Supreme Court rejected the view that "a victim of any crime would be deemed an especial beneficiary of a criminal statute's proscription." Id. at 294. Nothing in the text of 18 U.S.C. § 912, which is phrased in general proscriptive terms, indicates that Congress intended exceptional treatment for violation of section 912. See Alexander v. Sandoval, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'") (quoting Sierra Club, 451 U.S. at 294).

Finally, we find nothing in the legislative history, or elsewhere, that would support Frison's position. Section 912, enacted in 1948, consolidated two prior false personation statutes, 18 U.S.C. §§ 76 and 123. In 1915, the Supreme Court discussed the purpose behind the false personation statute:

> In order that the vast and complicated operations of the government of the United States shall be carried on successfully and with a minimum of friction and obstruction, it is important – or, at least, Congress reasonably might so consider it – not only that the authority of the governmental officers and employees be respected in particular cases, but that a spirit of respect and good will for the government and its officers shall generally prevail. And what could more directly impair this spirit than to permit unauthorized and unscrupulous persons to go about the country falsely assuming, for fraudulent purposes, to be entitled to the respect and credit due to an officer of the government? It is the false pretense of Federal authority that is the mischief to be cured; . . .

United States v. Barnow, 239 U.S. 74, 78 (1915). In United States v. Lepowitch, 318 U.S. 702 (1943), the Supreme Court reaffirmed Barnow and held that "the purpose

-10-

of [the false personation statute] was 'to maintain the general good repute and dignity of the (government) service itself.'" Id. at 704 (quoting Barnow, 239 U.S. at 80). And in Fullerton v. Monongahela Connecting R.R. Co., 242 F. Supp. 622 (W.D. Pa. 1965), the only published case involving a civil suit premised on violation of 18 U.S.C. § 912, the court, citing Lepowitch, held that a violation of § 912 does not give rise to a civil cause of action. Id. at 624-25.

Accordingly, because we find nothing in the statutory language, structure, or elsewhere from which it could be conferred that Congress intended to create a private right of action for violation of 18 U.S.C. § 912, Frison cannot pursue her claim under 42 U.S.C. § 1983. See Gonzaga Univ., 536 U.S. at 286 ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action."). Although we have found in favor of the appellees on this issue, we would be remiss if we did not register our concern with the police officers' conduct in this case. It is difficult to encourage the public to talk candidly with census workers when examples such this demonstrate that the public may be right to distrust someone who represents himself as a census worker. Congress' attempts to effect an accurate census are undermined by conduct of this type. Moreover, while the public's trust, and the government's reputation, is put at risk when anyone falsely assumes the identity of a United States officer, the offense is particularly egregious when the violator is a state law enforcement agent.

### III.

For the foregoing reasons, we affirm the ruling of the district court.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.